**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3246-23
A-0457-24

CLAREMONT CONSTRUCTION
GROUP, INC.,

     Plaintiff-Respondent,

v.

ARC NJ, LLC,

     Defendant-Appellant.

_____

CLAREMONT CONSTRUCTION
GROUP, INC.,

     Plaintiff-Appellant,

v.

ARC NJ, LLC,

     Defendant-Respondent.

_____

     Argued (A-3246-23) March 18, 2025 and (A-0457-24)
     June 3, 2025 – Decided August 15, 2025

     Before Judges Susswein and Bergman.

On appeal from the Superior Court of New Jersey, Chancery Division, Morris County, Docket Nos. C-000011-24 and C-000055-24.

Erin C. Borek (Phillips Lytle, LLP) argued the cause for ARC NJ, LLC.

Frederick W. Alworth and Kevin W. Weber argued the cause for Claremont Construction Group, Inc. (Gibbons, PC, attorneys; Frederick W. Alworth, Kevin W. Weber and Michael A. Conforti, on the briefs).

PER CURIAM

We consolidated these appeals that were argued on two separate dates for purposes of issuing a single opinion. The matters arise from trial court orders entered in two separate Chancery actions both involving an agreement for the sale of plaintiff Claremont Construction Group, Inc.'s construction business to defendant Arc, NJ, LLC.

In A-3246-23, defendant appeals from three orders dated June 12, 2024 which granted plaintiff's motion to confirm an arbitration award (Award) and denied defendant's motion to (1) vacate the Award; (2) modify the Award to correct mathematical and form errors; and (3) grant defendant leave to assert a counterclaim against plaintiff for setoffs.

In A-0457-24, plaintiff appeals from two orders dated August 30, 2024. The first order denied its request for injunctive relief to bar a second arbitration initiated by defendant and the second order granted defendant's motion to

dismiss plaintiff's complaint and order to show cause (OTSC) with prejudice and to compel arbitration. Plaintiff also appeals the court's order denying reconsideration. Plaintiff's subsequent motion requesting a stay of the second arbitration pending this appeal was granted by the trial court.

Based on our review of the record and application of the relevant legal principles, we affirm the trial court orders with one exception. We modify the orders of August 30, 2024 to permit the arbitrator in the second arbitration to determine what portion, if any, of the $899,051.20 credit provided to defendant in the first arbitration regarding the Hackensack Project was based on monies due from plaintiff to defendant under the subcontractor agreement for that project.

I.

We first address A-3246-23. We presume the parties are familiar with the pertinent facts and procedural history leading to this appeal, which we briefly summarize. The parties' disputes centered around the sale of plaintiff's construction business to defendant pursuant to a "Project Transfer Agreement" (PTA). A principal component of the PTA concerned an "earn-out" process in which plaintiff would transfer its ongoing contracts (Backlog Projects) to defendant without defendant paying "any upfront payment . . . for [plaintiff's] long-standing and successful construction business." The PTA contemplated

earnings for both parties would be based on "Estimated Gross Profit" (EGP). Rather than defendant paying an upfront amount to plaintiff, the parties would agree on the EGP at the outset of the project and defendant would pay plaintiff sixty-five percent of the EGP during the course of the project in quarterly installments. These payments were to be made regardless of what occurred on the actual project or with respect to actual profits. Thereafter, defendant would retain any additional profits or shoulder any losses.

The PTA contemplated the only projects that were subject to the EGP payment obligation were those that achieved the status of a "Backlog Project" under a procedure set forth in the PTA. The PTA also listed other types of projects including "Pipeline Rights," which if satisfied, transformed the project into a Backlog Project subject to EGP sharing.

When disputes arose between the parties concerning the sharing of the EGP, they submitted to arbitration before a single arbitrator from the American Arbitration Association (AAA) as required by the PTA. Plaintiff alleged it was owed $5,209,900.68 for its share of EGP for the ten projects in dispute based on the terms of the payout provisions in the PTA. In its damage calculations, plaintiff included $1,735,500 from the Bayonne 3 project alleging it received no EGP payments from defendant for this project. Plaintiff also included two other projects in the calculation: Pennrose and 81 Orange, which were not yet

awarded to defendant and categorized these projects as "Additional Pipeline Projects." Plaintiff alleged it was entitled to sixty-five percent of EGP if defendant was eventually awarded these projects.

Defendant filed a counterclaim seeking reimbursement of $5,065,184.14 which represented all the EGP paid to plaintiff on the ten disputed projects. Defendant argued because formal amendments to the PTA were never executed to include these projects as Backlog Projects, it had no obligation to pay any EGP to plaintiff. Defendant asserted plaintiff failed to satisfy a six-step process[1] set forth in the PTA as a condition precedent, to transform the disputed projects into Backlog Projects in order to be paid its share of the EGP.

Defendant also sought $9,189,250 in anticipated lost profits on nine of the projects which had not moved forward. Defendant claimed these projects should be included under the PTA. Defendant further sought recoupment of business

---

[1] The six conditions defendant asserts must be satisfied under the PTA for a Pipeline Right to become an Additional Backlog Project subject to sharing of EGP are: (1) plaintiff must own and control a right that is subject to transfer to defendant; (2) the parties must come to an agreement as to the price of defendant's work; (3) the Pipeline Right must be embodied in a Construction Contract with defendant for its work; (4) plaintiff and defendant must agree to EGP for the Pipeline Right; (5) the PTA "shall be amended" to remove the Pipeline Right and add such Right as an Additional Backlog Project; and (6) the PTA shall be amended to include such Additional Backlog Projects and the agreed upon EGP.

A-3246-23

losses allegedly sustained from 2020 to 2022 in the amount of $5,481,397. Finally, defendant sought $859,099.90 in "preconstruction costs" it allegedly incurred on projects that it was not awarded. Plaintiff conceded that $162,760.87 was due to defendant for the preconstruction costs claim.

The arbitration hearing took place over eight days. The arbitration process included discovery demands including substantial document productions, depositions, preparation and production of expert reports, motion practice, pre-trial submissions, an arbitration hearing with witness testimony from fourteen individuals, post-hearing written submissions, and post-hearing arguments. Following post-hearing briefing and oral argument, the arbitrator entered the Award on January 19, 2024 finding in favor of plaintiff totaling $4,043,887.27. This amount included interest and was a net amount after the application of credits to defendant from the Hackensack Project.

Defendant moved to modify the Award on February 1. The arbitrator denied defendant's application to modify the $4,310,849.48 principal award, but found the interest awarded required recalculation based on a different formula; finding an alternate start date for interest accrual for certain projects. The arbitrator determined, "in all other respects, the Award . . . is reaffirmed and remains in full force and effect . . . ." The parties thereafter agreed to a "Corrected Final Award." The Arbitrator required the parties to submit interest

calculations based on the corrected award, which were submitted, and subsequently entered a modified Award of $3,889,835.14 in favor of plaintiff on April 12.

Thereafter, plaintiff filed an action to confirm the Award on January 23, 2024. Defendant cross-moved to vacate or modify the Award and requested leave to permit the filing of a counterclaim for setoffs. On June 7, the trial court held oral argument. On June 12, the court entered an order confirming the Award and entering judgment in plaintiff's favor for $3,889,835.14, plus interest of $20,648, for a total award of $3,910,483.14 with per diem interest of $825.92 continuing to accrue beginning June 7. The trial court denied defendant's cross-motion in all respects.

On appeal, defendant contends the trial court erred by: (1) confirming the Award and entering judgment because the arbitrator's extra-contractual findings clearly and irrationally exceeded the powers granted under the PTA; (2) denying defendant's motion to modify the Award because it contains interest calculation errors and errors in its description of the projects at issue; and (3) denying defendant's motion to assert a counterclaim for setoff.

II.

"[T]he decision to vacate an arbitration award is a decision of law [and] this court reviews the denial of a motion to vacate an arbitration award de novo."

A-3246-23

Minkowitz v. Israeli, 433 N.J. Super. 111, 136 (2013). To promote arbitration as a judicially efficient dispute-resolution method, New Jersey law strongly favors enforcing arbitration awards and grants such awards considerable deference. Borough of E. Rutherford v. E. Rutherford PBA Local 275, 213 N.J. 190, 201 (2013). As such, "arbitration awards are given a wide berth, with limited bases for a court's interference." Ibid. "[W]hen a court reviews an arbitration award, it does so mindful of the fact that the arbitrator's interpretation of the contract controls." Ibid.

It is well established under New Jersey law that trial courts may vacate, modify, or correct arbitration awards only under the following specific circumstances:

> (1) the award was procured by corruption, fraud, or other undue means;
> (2) the court finds evident partiality by an arbitrator; corruption by an arbitrator; or misconduct by an arbitrator prejudicing the rights of a party to the arbitration proceeding;
> (3) an arbitrator refused to postpone the hearing upon showing of sufficient cause for postponement, refused to consider evidence material to the controversy, or otherwise conducted the hearing contrary to section 15 of this act, so as to substantially prejudice the rights of a party to the arbitration proceeding;
> (4) an arbitrator exceeded the arbitrator's powers;
> (5) there was no agreement to arbitrate, unless the person participated in the arbitration proceeding without raising the objection pursuant to subsection c.

of section 15 of this act not later than the beginning of the arbitration hearing; or

(6) the arbitration was conducted without proper notice of the initiation of an arbitration as required in section 9 of this act so as to substantially prejudice the rights of a party to the arbitration proceeding.

[N.J.S.A. 2A:23B-23(a).]

We review whether the trial court and arbitrator appropriately adhered to the controlling statute's requirements when considering vacating an order confirming an arbitration award. Recently, our Supreme Court addressed the vacation or confirmation of private sector arbitration awards in Rappaport v. Pasternak, holding:

[These] awards are thus subjected to an extraordinarily deferential standard of review.[] An award may not be vacated or modified simply because a court disagrees with the arbitrator's interpretation of the law or view of the facts; unless the statute's specific requirements for vacating or modifying an award are met, the award must be confirmed. N.J.S.A. 2A:23B-22.

That limited scope of appellate review promotes the objectives of arbitration. Absent the strict constraints on appeals from arbitration awards, "the purpose of the arbitration contract, which is to provide an effective, expedient, and fair resolution of disputes, would be severely undermined." Fawzy v. Fawzy, 199 N.J. 456, 470 (2009); see also Perini[Corp. v. Greate Bay Hotel & Casino, Inc.], 129 N.J. [479,] 536-44 [(1992),] (Wilentz, C.J., concurring).

[260 N.J. 230, 250-251 (2025).]

III.

We initially address defendant's contention that the trial court erred in confirming the Award because the arbitrator "clearly and irrationally exceeded the powers granted to him under the PTA."  An arbitrator's authority is limited to the powers conferred upon them in the parties' agreement.

> When parties have agreed, through a contract, on a defined set of rules that are to govern the arbitration process, an arbitrator exceeds his powers when he ignores the limited authority that the contract confers. The scope of an arbitrator's authority depends on the terms of the contract between the parties. Communications Workers v. Monmouth County Bd. of Social Servs., 96 N.J. 442, 448 (1984).  Both the jurisdiction and the authority of the arbitrator are circumscribed by the powers delegated to him by the contract of the parties.  [Ibid.]; see Kearny PBA Local # 21 v. Town of Kearny, [] 81 N.J. [208, 217 (1979)]. Thus, an arbitrator may not disregard the terms of the parties' agreement, State v. State Troopers Fraternal Ass'n, [] 91 N.J. [464, 469 (1982)], nor may he rewrite the contract for the parties.  In re Arbitration Between Grover and Universal Underwriters Ins. Co., [] 80 N.J. [221, 230-31 (1979)].
>
> [Cnty. Coll. of Morris Staff Ass'n v. Cnty. Coll. of Morris, 100 N.J. 383, 391-92 (1985) (citations omitted).]

In this instance, the PTA authorized the arbitrator to resolve all issues and disputes arising out of the PTA in accordance with AAA's Construction Industry Arbitration rules.  The pertinent portion of the arbitrator's decision stated:

10

[Plaintiff] is entitled to the sums claimed for unpaid EGP for projects that have been awarded and/or performed. The EGP for these projects were either formally agreed to in the PTA or were included time and time again in the update calculations provided by [defendant] to [plaintiff] which set forth the EGP, amounts paid, and amounts owed. The fact that on some projects there were no formal amendments to the PTA or at times formal agreements as to EGP is overcome by the inclusion of the projects and EGP figures in the updates, and perhaps more importantly, the actual payment of more than 60% of the claimed EGP (73% if Bayonne 3 project is excluded from the calculation). These affirmative, voluntary actions by [defendant] are clear admissions of EGP calculation and monies owed. I do not find persuasive [defendant's] argument that the updates were mere "forecasts" and that the payments a mere conditional advances.

The trial court reviewed the arbitration record and Award and determined:

Defendant has not provided sufficient evidence that the [a]rbitrator contradicted the express language of the contracts at issue. Defendant denies that the parties agreed on the transformation of projects into Backlog Projects. However, it is clear that the [a]rbitrator considered the issue and the parties' arguments and found that an agreement was made pursuant to the parties' conduct in the course of their dealings with each other. Further, [d]efendant has not highlighted any provision or term in the relevant contracts requiring that the parties enter into a written agreement to transform a project into a Backlog Project. The [c]ourt does not find that the [a]rbitrator's decision is contrary to the express terms of the parties' contracts and agreements and thus, did not exceed his powers.

11

Defendant reprises the arguments made at the arbitration and before the trial court; requesting us to essentially ignore the arbitrator's finding that the course of conduct evidence showed the parties contemplated payments of EGP to plaintiff for the disputed projects. Defendant contends because plaintiff failed to comply with the specific six step procedure in the PTA to transform the ten disputed projects to Backlog Projects, it was not required to pay plaintiff any EGP for those projects.

Although typically, contracts are "given their plain and ordinary meaning" M.J. Paquet v. N.J. Dept. of Transp., 171 N.J. 378, 396 (2002), nevertheless, "'[e]ven when the contract on its face is free from ambiguity, evidence of the situation of the parties and the surrounding circumstances and conditions is admissible in aid of interpretation.'" Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 501 (App. Div. 2001) (quoting Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 296 (1953)).

Despite defendant's argument that the arbitrator never used the words "course of conduct," the record reflects he found "the EGP for these projects were either formally agreed to in the PTA or were included time and time again in the updated calculations provided by [defendant to plaintiff] which set forth the EGP, amounts paid, and amounts owed." We conclude this language describes a "course of conduct" and the trial court's use of this terminology was

an appropriate and accurate description of the arbitrator's findings. The arbitrator specifically rejected plaintiff's contention their calculations of EGP for these projects were only "forecasts" and specifically pointed out that defendant had already paid plaintiff substantial amounts of EGP for the projects. The trial court agreed with the arbitrator's findings. After our de novo review and the application of the "extraordinarily deferential standard of review" pursuant to Rappaport, we concur with these conclusions. The evidence in the record clearly supports both the arbitrator's and trial court's findings that the parties communications and "course of conduct" showed plaintiff was entitled to EGP on the ten projects which were in dispute.

We next address defendant's contention that the arbitrator made several "computational and/or form errors." Specifically, defendant asserts the errors consist of: (1) two interest miscalculations; (2) the contractually mandated fee for St. Lucy's and Bayonne 3 and Bayonne 3's current project progress; (3) the EGPs listed in defendant's Financial Reporting/Forecasts; and (4) Bayonne 3's disappearance on the final iterations of the supposed "amendments" to the PTA.

We conclude these arguments are without sufficient merit to warrant discussion in a written opinion and affirm for the reasons stated by the arbitrator in the Modification of Award and the reasons expressed by the trial court. R. 2:11-3(e)(1)(E). We add the following comments.

13

A court may modify or correct an award if:

> (1) there was an evident mathematical miscalculation or an evident mistake in the description of a person, thing, or property referred to in the award;
> (2) the arbitrator made an award on a claim not submitted to the arbitrator and the award may be corrected without affecting the merits of the decision upon the claims submitted; or
> (3) the award is imperfect in a matter of form not affecting the merits of the decision on the claims submitted.
>
> [N.J.S.A. 2A:23B-24(a).]

After our de novo review, we conclude, as did the trial court, a review of the arbitrator's revised Award "demonstrates that the Arbitrator set forth his basis for the calculation of the amount due and the interest rates" and "provided tables in his decision explaining in detail the calculations." We agree with the trial court that there was no "mathematical error in need of correction," and the defendant's argument concerned the "method of application of the interest rates to the parties award" not the actual calculations. We thus conclude the formula utilized by the arbitrator does not fit the category of "mathematical error" listed under the statute.

As aptly noted by plaintiff, our Supreme Court in Tretina v. Fitzpatrick and Associates, held:

> The clear purpose of that section is to enable the court to correct simple arithmetical errors, such as 2 + 2 = 5,

14

> or obvious mistakes in identification, such as 14 Hill Street instead of 41 Hill Street. <u>See</u>, e.g., <u>Creter v. Davies</u>, 30 N.J. Super. 60, 62 (Ch. Div.) (applying N.J.S.A. 2A:24-9a to correct arithmetical error on face of award), <u>aff'd</u>, 31 N.J. Super. 402 (App. Div. 1954).
>
> [135 N.J. 349, 359 (1994).]

Based on the statutory language and cited case law, we conclude there were no mathematical errors by the arbitrator nor was there error by the trial court in upholding the arbitrator's finding. We conclude the Award set the date each project was completed, the principal amount due on that date, and the interest rate to be applied. There were no mathematical miscalculations by the arbitrator in those determinations.

We next address defendant's contention the trial court erred in denying defendant's motion to assert a counterclaim for setoff because the amount of the award should be reduced to reflect plaintiff's offsetting obligation to defendant. Defendant argues because plaintiff is no longer operating, it is left with no remedy if it obtains a judgment in the Hackensack Arbitration. Defendant asserts that a "provisional offset" of $2,084,220.03 must be provided pending the outcome of the Hackensack Arbitration. We conclude this issue is moot based on our opinion in A-0457-24 which follows.

15

IV.

We now address defendant's appeal in A-0457-24.  Again, we presume the parties are familiar with the pertinent facts and procedural history leading to this appeal, which we briefly summarize.  In addition to the PTA, the parties entered into a subcontractor agreement dated June 1, 2019 which designated plaintiff as the "contractor" and defendant as "subcontractor" for the Hackensack Project.  Defendant was to perform work on the Hackensack Project and plaintiff was required to compensate defendant pursuant to the terms of the subcontractor agreement

Plaintiff alleges defendant performed poorly at the Hackensack Project, which resulted in defendant only paying plaintiff $191,381 of the $1,090,432.20 amount of EGP owed to it under the PTA.  Plaintiff asserted these performance failures by defendant caused the owner, Sonehan, to stop paying under the contract.  The subcontractor agreement required "the Contractor [plaintiff] [to] make progress payments on account of the Subcontract Sum to the Subcontractor [defendant] . . . ."

In response, defendant alleges the project faced significant delays and execution issues arising from plaintiff's performance as the contractor.  Defendant contends plaintiff failed to pay for work defendant performed on the Hackensack Project.

16

Plaintiff eventually filed for arbitration against Sonehan (Sonehan Arbitration) based on Sonehan's failure to pay plaintiff under their contract. Plaintiff alleged it notified defendant of the Sonehan Arbitration and invited defendant to participate but defendant declined.

In April 2024, at the time the parties' cross-motions concerning the first arbitration were pending before the trial court, defendant instituted a second arbitration to recover the funds plaintiff allegedly owed it under the subcontractor agreement for the Hackensack Project. Plaintiff filed a complaint and OTSC to enjoin the arbitration from occurring based on the entire controversy doctrine (ECD) and defendant cross moved to compel the arbitration.

After the trial court heard argument, it found "the [s]econd [a]rbitration, also referred to as the Hackensack Arbitration, is not precluded by the [f]irst [a]rbitration by the [ECD]" because the first arbitration included only "[p]laintiff's claim for unpaid EGP on the projects subject to the PTA" and did not include "[d]efendant's claim for payment for which it was the subcontractor." The court found that "[d]efendant did not have a 'fair and reasonable opportunity to have fully litigated' its claim for damages as a subcontractor in the [f]irst [a]rbitration." The court also found that "the [c]ourt, not the arbitrator, is to

17

decide the issue of whether the [Hackensack] Arbitration is precluded by the [ECD]."

The court also determined "[d]efendant's claim was not ripe at the time of the [f]irst [a]rbitration since plaintiff had not yet obtained a final judgment in the arbitration against the owner [of the Hackensack Project] Sonehan, until after the [f]irst [a]rbitration concluded."

Plaintiff moved for reconsideration of the trial court's August 30, 2024 orders. The trial court entered an order denying plaintiff's motion for reconsideration and issued a written statement of reasons in support of its order. The court found that "[t]he [f]irst [a]rbitration dealt exclusively with [p]laintiff's claim for unpaid EGP on the projects," whereas "[t]he [s]econd [a]rbitration will address defendant's claim for payment as a subcontractor [under the Hackensack Project Completion Subcontract]." The court determined "[t]he two claims arise from different contractual agreements and obligations" and "do not arise from the same nexus of operative fact . . . ." and again rejected plaintiff's argument the second arbitration should be precluded based on the ECD.

With respect to defendant's claim of "ripeness," the trial court found "[d]efendant could not know if [p]laintiff would pay the alleged amounts in question," and "[i]t was only after the confirmation of the [Sonehan Arbitration] award that defendant could be sure that they would receive a fractional amount."

The court found defendant had referenced the $2.1 million in damages allegedly owed by plaintiff in its statement of counterclaim, but "did so as background information to highlight any alleged problems it inherited from [p]laintiff as [its] subcontractor." The court found that defendant did not seek the $2.1 million in damages as relief. The court found the testimony regarding the performance on the Hackensack project was "offered and heard to provide context surrounding the issues [d]efendant faced in its performance affecting the EGP calculation." The court found the testimony was not offered to litigate monies owed by plaintiff to defendant for its subcontracting work.

On appeal, plaintiff asserts the trial court erred by: (1) denying its OTSC and dismissing its complaint because defendant's $2.1 million claim in the Hackensack Project was a compulsory counterclaim belonging in the first arbitration, and the ECD precludes defendant from bringing this claim in a subsequent proceeding; (2) determining its claims were not ripe by finding the Sonehan arbitration was not complete and its claims depended on the amount of that award, if any; and (3) failing to consider evidence presented in the first arbitration regarding defendant's performance as a subcontractor for the Hackensack Project.

A-3246-23

In regard to plaintiff's contention that the trial court erred by not precluding the second arbitration under the ECD, we affirm substantially for the reasons set forth by the trial court. We add the following comments.

The ECD "embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy." Wadeer v. N.J. Mfrs. Ins. Co., 220 N.J. 591, 605 (2015) (internal quotation marks omitted).

> We have previously expressed that the purpose of the [ECD] are "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay."
>
> [Ibid. (quoting DiTrolio v. Antiles, 142 N.J. 253, 267 (1995)).]

Rule 4:30A generally provides that the "[n]on-joinder of claims required to be joined by the [ECD] shall result in the preclusion of the omitted claims to the extent required by the [] doctrine[.]"

"In determining whether a subsequent claim should be barred under [the ECD], 'the central consideration is whether the claims against the different parties arise from related facts or the same transaction or series of transactions.'"

at 605 (quoting <u>DiTrolio</u> at 268). "'It is the core set of facts that provides the link between distinct claims against the same parties . . . and triggers the requirement that they be determined in one proceeding.'" <u>Ibid.</u> (quoting <u>DiTrolio</u> at 267-68).

When a party had a reasonable opportunity to fully litigate their claim in an earlier action, the ECD may be invoked to bar the raising of that claim in a second proceeding. <u>Karpovich v. Barbarula</u>, 150 N.J. 473, 481 (1997); <u>Hillsborough Twp. Bd. of Educ. v. Faridy Thorne Frayta, P.C.</u>, 321 N.J. Super. 275, 284 (App. Div. 1999). The doctrine does not, however, apply to "bar component claims that are either unknown, unarisen or unaccrued at the time of the original action." <u>Id.</u> at 283. The ECD remains an equitable doctrine whose application is left to judicial discretion based on the factual circumstances of individual cases. <u>Highland Lakes Country Club & Cmty. Ass's v. Nicastro</u>, 201 N.J. 123, 125 (2009) citing <u>Oliver v. Ambrose</u>, 152 N.J. 383, 396 (1998).

We conclude the court did not err by determining the ECD did not apply and did not preclude defendant from arbitrating its claims through a second arbitration. The issues in defendant's counterclaim were not presented as a dispositive issue or adjudicated in full at the first arbitration. Further, the arbitrator's decision was unclear as to whether defendant's claims based on monies due to it under the subcontractor agreement were fully considered.

The parties dispute whether the first arbitration fully decided the credits due to defendant from the Hackensack Project. We conclude the arbitrator's decision is unclear as to whether the $899,051.20 credit awarded to defendant was based only on EGP or on monies due to defendant under the subcontractor's agreement, or both. From the record presented, it is apparent the arbitrator found defendant asserted it was owed $2.1 million as unpaid fees from plaintiff based on the subcontractor's agreement for the Hackensack Project in the first arbitration. We therefore remand to the trial court to enter an order requiring the arbitrator, at the second arbitration, to determine (1) credits due to defendant for EGP pursuant to the PTA, if any; and (2) monies due to defendant pursuant to the subcontractor agreement, if any.

We make no determination concerning the amounts or credits due and leave this to the discretion of the arbitrator. Nor do we determine or limit the amount of EGP credits or compensation due to defendant, if any, under the PTA or the subcontractor agreement respectively. We also leave to the arbitrator to decide whether the determinations in the Sonehan arbitration are relevant to the claims of the parties, and if so, the appropriate relief required.

To the extent we have not addressed any of the parties remaining arguments, we conclude those arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

22

Affirmed in part and modified and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3246-23